in the first case, which is Horror Inc. v. Miller, number 18-3123. We're sitting with our colleague, Judge Winter, who is available on the screen. Is that right? I don't think I'm on the – Just by phone. I see. Pardon me. Okay. I hadn't quite understood. So, Judge Winter, can you hear us? Yes, I can. Can you hear me? Yes, we can. Very good. Ms. Sullivan, please proceed, then. Good morning, Your Honors, and may it please the Court. Kathleen Sullivan for Horror and Manny. Victor Miller cannot recapture the copyright to the screenplay for Friday the 13th under Copyright Act Section 203A if that screenplay was written as a work-for-hire under Copyright Act 1011, and the district court erred in holding that the screenplay was not a work-for-hire as a matter of law at summary judgment. And I'd like to go directly to the simplest reason why you should reverse that ruling, and that is it was legal error under Community for Creative Violence Against Reed – Creative Nonviolence Against Reed. It was legal error under Reed to regard the union contract that was governed by the collective bargaining agreement executed between the Writers Guild of America, the federally recognized union in the case, and Manny at the time of the writing. It was legal error to deem that irrelevant to the Reed analysis. Now, putting aside whether, as we've argued in the brief, the union contract is virtually dispositive in this case, at a minimum it is relevant to the analysis of whether Miller acted as an employee or as an independent contractor. Well, this is Judge Winter in Tropical New Haven. He said he used the term irrelevant, but he seemed really to mean that it didn't have the effect in the case that your side was arguing for. Correct. It certainly is relevant, all the contracts. I mean, it's relevant at least to the extent that the plaintiff's contract or the defense of one of the parties' contract would the producer mention the collective agreement. Judge Winter, I would respectfully suggest that the Court did treat the MBA, the basic agreement here, the collective bargaining agreement, as irrelevant even as a factor to be considered in the Reed analysis and as a lens through which to view the Reed factors. Those are the two errors. We're dealing with separate statutes, and we've said that Congress has used the term employee in the Title VII context and the labor relations context and the copyright context to have different meanings because Congress had different purposes in enacting each of those statutes. So, you know, we looked at the common law factors, the Reed factors outlined. We give them the weight that the circumstances require in light of the purposes of the Copyright Act. Why do we need to look at the NLRA at all or consider that there is a collective bargaining agreement? I don't understand why that should have any bearing on how we assess those factors. Your Honor, putting aside whether the NLRA needs to be harmonized here with the Copyright Act, what we would suggest is that the union contract here governed by the collective bargaining contract here are relevant to the circumstances of this case that you must consider under Reed. Reed itself and Ames and Langman Fabrics, the governing Second Circuit cases, all say look to the particular circumstances of the case. And the union contract is at least a relevant factor in the circumstances of the case. Kagan. So how does it affect the 13 Reed factors or bear on other considerations that ought to come into play in making the copyright determination that's before us? Two ways, Your Honor. It should be considered as an additional factor because Reed says its list is non-exhaustive. So does restatement of agency second, section 220. So you mean when you say it should be considered as an additional factor, the fact that there is a collective bargaining agreement and that he was a member? That's correct. An additional factor, I hold in my hands, Judge Winter, a Bible, the 1977 master bargaining agreement that was negotiated by the WGA that governs every aspect of a writer's or screenwriter's compensation. It's the Bible of a screenwriter's life. And we refer you in particular to all the benefits that the WGA got as a matter of collective bargaining. We list them in the blue brief at pages 11 to 12. And they couldn't, the WGA could never have gotten all of those collective bargaining benefits unless it represented screenwriters as employees, as the NLRB blessed in 1938 in MGM. Yes, but of course, you know, in 1938 circumstances were different. The NLRA has purposes that are entirely different from the heavily negotiated Copyright Act in 1976. And the Copyright Act looks to the relationship between the sponsor of a creative work and the creator of the creative work and works out a very specific calibration of interest as is reflected also in the alternative way of showing a work made for hire that enumerates the nine different exceptions. So, Your Honor, two points. The 101, 102 are belt and suspenders. Belt and suspenders, the two parts of the 1976 agreement, give employers two ways to preserve work for hire as the basis for their authorship and therefore their ownership of their authorship of a copyright. One is the standard way that goes back to all prior iterations of the Copyright Act. If the work was done by an employee in the course of his employment, it's a work for hire, 101. 101, 102 adds an additional way that you can have a work for hire. That is, even if you're an independent contractor in the motion picture business, you can put work for hire as a plain statement in your contract. This is not a 101, 2 case, but there's nothing exclusive about those. 101, 2 would apply to nonunion contracts in the motion picture. Scalia. I'm sorry. Are you saying there's more than two ways? Kagan. No. There are two ways. And we come under 101.  Scalia.  Kagan. I'm sorry, Judge Walker. Scalia. Go ahead. I mean, you're not arguing that there was an agreement that they understood that? We're not, Your Honor. But I do want to make sure I answer both. I want to answer Judge Winter's question. How did the judge err? He erred by treating the contract as irrelevant. The contract governed by the collective bargaining agreement, which could only be made. Well, what effect does the contract have in this case? I'm sorry, Your Honor? Why don't you cut to the chase and pass over whether it's relevant or not. I agree it's relevant. Okay. Here's why it's relevant. It's an additional factor that tells you how the industry operates, and that's an important additional factor, which Reed says you must consider, so does the restatement. It's an additional factor that should be considered. And the additional factor, and Judge Carney, yes, the NLRA and the Copyright Act are different, but they each define employee according to the common law of agency. And if one is defined as an employee for purposes of collective bargaining, remember, it would violate the NLRA. But they look to different factors for different purposes, I think. Why was he an employee for purposes of collective bargaining? Because there were a number of benefits he got. He's in the heartland of the bargaining unit. He's a screenwriter writing a screenplay. He got benefits. Excuse me. Aren't there all kinds of subcontractors who have to pay their employees according to which the person they're working for has a collective agreement with unions, that unions have a right to bargain over what is paid to subcontractors? Your Honor. Or independent contractors? Your Honor, with respect, no. The union can bargain collectively. No? Only on behalf of employees. It might be relevant to the antitrust analysis if there needs to be some additional representation beyond the employees. Isn't it a mandatory subject of bargaining? Your Honor, let me go to the read factors. You asked me how do the read factors work here. And let me show how we should win under the read factors. We think we should win as a matter of law. But if I could just focus on control. Well, in doing that, though, could you focus on the subset of the read factors that we identified in Ames? Sure. For example, tax treatment. Tax treatment is at best neutral here. Under section 14. Were taxes ever withheld from any of the payments made to him? The evidence is indeterminate. There's no evidence that there were taxes withheld. There's no evidence that a 1099 form was issued. So this is different, Judge Walker, from the Ames case where a 1099 was issued by the swimming pool contractor to the computer programmer. There's no evidence either way. But, Your Honor, I would respectfully submit that the district court legally erred in ignoring section 410C of the Copyright Act, which says that where a copyright registration states facts, those facts are presumed true, and it was Miller's burden to come forward with the 1099 under the presumption. So tax should benefit Manny, not Miller, in the absence of proof of a 1099, as it was in Ames. How do we factor in if the membership in the union is a factor, as you're arguing? Where does it fit into the hierarchy of read factors? And there seems to be a hierarchy. There seems to be the Ames, at least under our cases, there's the Ames, the five Ames predominant factors, and then there's the other factors. And if you find one way with the first five, then the other way sort of has to be measured against that. Your Honor, I would love to answer Judge Walker's question. I'm going to run out of time. May I go over my time? Thank you, Your Honor. Judge Walker, we would suggest that the union contract here between a union member and a union signatory, a contract that was in the heartland of the bargaining unit, screenwriting by a screenwriter. This is not a two-hat case about a producer-director or an orchestra-leader musician, as in Carroll or HBO. So we would submit that in that circumstance, the union contract governed by the collective bargaining agreement, which could only have been done by the WGA if it was representing employees, screenwriters being employees under MGM, we submit that should be the most important factor. It's an additional factor. But, Your Honor, Restatement Second of Agency, Section 220, Comment I, is very instructive. It says, and this is common law of agency, look to the custom of the community. The custom of the community here is screenwriters, like directors and actors and other people who might seem in a vacuum to be independent contractors, got unionized. They go on strike. They show up. Kagan. You're talking in the labor context, labor law context, copyright context, as we've seen in the Title VII discussion of how we apply the common law of agency, we might weight the factors, the read factors, differently in different contexts. Correct, Your Honor. Let me go to the second and most important factor for copyright. So we would say the union contract is a new factor that's first in the hierarchy. Then go to the one that you have always said in Salomon, Langman, and other cases is the most important read factor, Ames, control. The key to this case is control. The right to control. And here at a minimum. How is that memorialized, the right to control? The right to control? Well, it was the. . . It seemed to me you were pointing to actual people. They worked together. They collaborated. They were collaborators. They didn't see control so much. They collaborated. Your Honor, that. . . I don't know the case, but there's a case where somebody stood over the other person. That's Langman Fabrics. Okay. And watch it. That didn't happen here. Well, Your Honor, not so. I would respectfully refer you, if you look at nothing else in the record, look at the two Sean Cunningham declarations at JA87-97 and JA635-40, where it's hotly disputed how much control there was. Miller said. . . That's suggested to me he might have sought co-authorship. Absolutely, Your Honor. And. . . That's different from being an employee or having an employee. Your Honor, the union contract. And let me give you some places to go in the collective argument. Why don't you take just one more minute, okay, since we're a little bit over. Yeah. Control. . . We think the following factors favor Manny over Miller. Control. . . And it's at a minimum a disputed issue of fact. Just, Your Honor, as it was in Langman. Langman sent it back to the district court because control was disputed. Second, we think lots of factors favor Manny over Miller. The work screenwriting was part of Manny's regular film production business. Miller used Manny's secretary, copy machine, paper, and office. Miller had no assistants. He worked for Sean Cunningham, but no one worked for Victor Miller. The skill required was exactly incident to this business. So the skill required, of course screenwriting is skilled. He didn't know anything about horror movies when he came. But, Your Honor, if you look at Restatement Comment I, it says that when the skill is deployed in the ordinary course of business, then even if you have a lot of skill like a skilled chef, you can still be the master's servant. Very good. We have your brief, Ms. Sullivan. Thank you, Your Honor. Mr. Tobaroff, please. Good morning, Your Honor. Your Honors, may it please the Court. As shown in our brief, this case is relatively easy to decide. Miller is, the factors point to the fact that Miller is as prototypical an independent contractor as you could. What do you do about the judge's determination that the bargaining agreement labor relationship is irrelevant? How can it be irrelevant? Well, first of all, Judge Onerhel went through an extremely detailed analysis of his union membership, so he didn't treat it, the argument, as irrelevant. He concluded that it's not a, first of all, they posited it. He didn't weigh it as among the Reed factors. He didn't weigh it as among the Reed factors. In the Second Circuit case, Solomon says that any additional factors that you consider must be drawn from the common law of agency. The fact of union membership is not drawn from the common law of agency. The Reed test, where you look at various factors, and the Ames factors, where they chose five that are most important. The Reed test is applied in a number of different statutory situations. In Article, and we point on page 40 of our brief, a number of cases under Article 7, age discrimination cases, American Disability Act cases, where you have to determine, ERISA cases, where you have to determine whether a hired party is an employee or an independent contractor. And in those cases, the hired party was a union member, and no, none of those cases looked at union membership as a common law agency factor. They didn't find it to be relevant either. Instead, they went through the Reed factors or the Ames high-priority factors and made the determination based on the common law of agency, which is the correct way to handle this. And you say it wasn't relevant. It was certainly within the scope of their consideration, but they assigned it no weight. Correct. Correct. I think relevant or irrelevant is sort of a straw man, you know, to knock down. They assigned it no weight. And in 42 years since Section 101 has been operative, the work-for-hire provision of the Copyright Act, no court, and they cannot point to a single case that determines work-for-hire under labor law. Their arguments are wrong as a matter of copyright law, where you must apply the Reed factors or the Ames factors. It's wrong as a matter of labor law. Maybe you could address, actually, what Ms. Sullivan was saying about the application of the Reed factors. Definitely. Did Mr. Miller get benefits under his membership? He was entitled to them from Manny. I would address each of those factors. If you would. All right. So, firstly, he received ‑‑ firstly, let's be clear. Under Woods v. Born, a 1995 Second Circuit case, specifically dealing with Section 203 termination like this case and the work-for-hire defense, because work-for-hire is an exception, a statutory exemption to termination, the party claiming it has the burden of proof. This is black letter law. Now, that burden did not shift, as in the Langman Faber's case, because they cite a registration by Georgetown, not Manny, saying Georgetown was the author of the film, not the screenplay. So it wasn't Manny that did that registration, unlike in Langman Faber's, and it wasn't dealing with the screenplay. It was dealing with the film. And what about the tax treatment? Okay. So each of those factors. Number one, the tax treatment, they have the burden. They provided no probative evidence whatsoever. Don't you have the burden, though, showing that the exemption applies? No. They do. Again, Woods v. Born, since it's a statutory exemption, the party asserting the exemption has the burden of proof as to the exception. This is black. And wasn't it, though, unclear from the record? Didn't the district court improperly draw an inference about whether taxes were withheld or not based on the documents that were available? Not at all, because they had the burden. They provided no evidence that documents were held. Cunningham himself in his deposition stated that he did not recall withholding taxes, and he didn't believe he even filed a tax return for the Manny company because it was a shelf company that only produced one other film. On the other hand, Miller had a letter from Cunningham enclosing the flats, a check for a certain flat sum, which is stated in the letter, which matches exactly the payment that was due under his agreement in turning in the screenplay. So we had probative evidence that there was no tax withholding, and they had they with the burden had none. And under Anderson and Celotex, that entitles Judge Underhill to rule as a matter of law that there was no tax withholding. As far as the benefits are concerned, they admitted that they directly supplied no traditional employment benefits such as health insurance, paid vacation, and such. They pointed only to the fact that the Writers Guild, a third party, had a pension and health plan. First of all, there's a question, that's not attributable to Manny. And remember, we're looking at these factors to, in order to distinguish between whether he was an employee or an independent contract of Manny. So the fact the Writers Guild has a health plan does not help in that analysis. But even if it did, they subpoenaed the Writers Guild and the records from their health plan, and those showed that Cunningham did not even make the contributions to the WJA benefit plan that he was supposed to. And what about control? Ms. Sullivan was saying, you know, and the record seems to reflect that Mr. Cunningham was there with Mr. Miller. They were suggesting ideas. He didn't know how to write horror films. He had never done one before. They were telling him how it needed to end. They were heavily involved in that and directed what the work product came out like. Let me address that factor. Four out of the five high priority factors in Ames weigh very securely in favor of independent contractor status. The fifth factor, control, I would submit is inconclusive for the following reasons. In the Reid case, the Supreme Court said ---- Sotomayor, you're saying it's not disputed as a matter of fact. It's just what it means, what the record means. It doesn't weigh one way or the other. On the record, it's inconclusive. And in any event, it's not dispositive, even if it weighed more strongly in favor of Manny being an employee, an employee status, Miller being an employee. And I'll tell you why. In the CCNV case, in the Reid case, the Supreme Court stated unequivocally that every hiring party is going to have final approval, final control, and the ability to supervise the hired party. That's the case. And if too much weight is placed on the---- Kagan. But you're saying in an independent contractor context as well as an employment context----  ----there is authority. Exactly. And the Supreme Court specifically rejected the control factor as being dispositive because they said otherwise, you're back to the old actual control test, which the Supreme Court rejected. In Reid, for instance, they had the most detailed control over the homeless sculpture down to providing models to the sculptor of what the sculpture should look like. He wanted them to have shopping, the homeless people to have shopping bags, and they said no, it's got to be a supermarket cart. There was supposed to be steam coming out of a grate. If you look at the case, they controlled down to the most minute detail, and still the Supreme Court had no problem finding that Reid, a skilled professional like Miller, was an independent contractor. In the Ames case, there also they also found a heavy degree---- The district court here found against you, didn't it, on that particular factor, the control factor? The district court---- Tilted towards employee. It said it tilted. His words were it tilted slightly towards employee, but is not the---- It was outweighed by the others. It was outweighed by four of the five other high priority---- You're saying he was wrong in saying it should have been tilted towards the employee. I think it's equivocal. It's a matter of degree. I think it's equivocal, and because they point to things. You see, the purpose of looking at these, and we can't lose sight, is to distinguish between an employee and contractor. So in any situation where you're writing a screenplay, the director, the producer, the studio, they are always going to make comments. They make high-level comments like make it funnier, make it scarier. You should kill someone off in the first act. The killing should feel personal. These are the kind of high-level comments that are made by every producer or director. It's not the kind of control you had in Langman Fabrics where the worker, first of all, worked in the office every day, normal hours, and literally they told the texture. If you go to that case and you look at the degree of control, it's chalk and cheese, as the British would say, when you compare it to the control in this case. Well, isn't it odd that there's a collective bargaining agreement, we have an employee recognition by the NLR, by the Labor Board, this is the kind of work that's intended to be governed by the collective bargaining agreement that's negotiated, and this is the type of work that's supposed to be done. I mean, how can we just ignore that? We're not ignoring or dealing with it specifically. The fact of the matter is in the old days, in the 30s, during the golden ages of Hollywood when you had the studio system, writers worked like in a sweatshop. They were employees. And even then, but in that case, the NLRI applied to employees and independent contractors equally, and they acknowledged that screenwriters also worked as freelancers. With the demise of the studio system in the 50s, almost all screenwriters work as independent contractors. That's why, as the Court noted, the current Writers Guild short-form agreement specifies under Section 101.2 that the commission work is work for hire. So the reason why screenwriters work today or work for hire is the form agreements and all agreements treat the workers as independent contractors. The only writers today in Hollywood that arguably don't work as independent contractors are those who have lived on for many, many years. So there's nothing that interesting about the fact that Miller is a member of the union. Directors are members of the union. In the HBO versus Directors Guild case, the Court in the Southern District of New York noted that union members can be independent contractors and employees, and sometimes the same person will work as an employee in some instances and an independent contractor in other instances. Kagan. How did you have to go through the Reed factors on each occasion to determine what the relationship was with respect to a worker? You absolutely do. That's our point. And under the Reed factors, I believe we win hands down. Four out of the five Ames factors favor independent contractor status. And then when you look at the other Reed factors, he worked from home. He chose his own hours. He liked to work very early in the morning. He was paid a flat sum. He wasn't paid a salary. He supplied his own instrumentalities, a typewriter, ribbons, paper. The fact after he created the script, it was Xerox at Cunningham's office, that's of no moment whatsoever. Thank you very much. Your red light is on. I'm sorry. We have a heavy calendar today, so I'm trying to keep us on the log. And my only regret is that this hearing is on Thursday the 13th instead of Friday. I had to get that line in. Your Honor, if the MBA is factored into the Reed analysis, things that look like independent contractor activity in a vacuum, it becomes clear they are activities of an employee represented by the WJA. Location of work, MBA Article 19A guarantees the right to work from home and says it's for the convenience of the employer. Method of payment, flat fee per writing project, that's guaranteed by the MBA. The MBA gets a flat fee schedule. In fact, the payment here was taken exactly from J.A. page 310, where the number 5613, the payment is set out. The method of payment is flat fee and project by project because the union bargained for that right on behalf of its screenwriter employees. But that doesn't, that surely doesn't eliminate them as appropriate factors for consideration under Reed and weighing in a different way in light of the context. If all employees as well as all independent contractors are working at home, that doesn't really tell us much. Well, Your Honor, it does tell you that the WGA was allowed to be a union that bargained for its members, even though even in 1938 the writers were working from home. The NLRB decision in MGM, the employer said how can they be our employees? They're working from home. And the NLRB said it doesn't matter if they're working from home, they can still be employees. So this fiction that once upon a time they all worked in cubicles isn't true. But Your Honor, what happens is that's right. And why should the labor considerations trump the other? Your Honor, I'm asking you to skip everything in my brief to page 34, start at page 34, and rule in our favor because Reed should have incorporated the MBA as a factor and as a lens through which to view the other factors. Are you abandoning your first argument? No. Is this positive? No. I don't press it here. We think it's right, but we think you should reverse just on the grounds that the MBA should have been factored into Reed. And to answer Judge Winter's question, where did the judge say he couldn't take the MBA into account, I respectfully urge you to look at pages, special appendix pages 44 and 45, where he said the magic words in the MBA cannot affect my Reed analysis because that would be disregarding Reed. Not so. The context matters. And the context here is Hollywood has a grand bargain where screenwriters who might look like independent contractors in a vacuum are unionized employees who get benefits as unionized employees. And the benefits factor, which is very important. Let me go to another question here. The standard for reviewing the district court, presumably these factors and the findings of these factors are for the district court. I think we start off with the idea that basically what's before us, we're looking at de novo, but what about the balancing of the factors? Isn't that for the district court primarily? It is, Your Honor, but two problems with that. One, he legally erred in ignoring the MBA as a lens through which to look at everything. What do you want us to do in this case? Do you want us to find for you or do you want us to send it back for him to redo  We think you can find for us because you can read the MBA as well as the district court, but at a minimum, as in Langman Fabrics, the feather textile case, you must send it back because there are disputed issues of fact. You heard my friend, Mr. Toberoff, argue with you a lot of facts, good jury argument, but the jury didn't get to hear it because we argue that Cunningham exercised control just as the man in the feather case stood over the feather drawer, so did Thank you. Okay. Your Honor, we respectfully ask that you add a minimum remand so that the disputed issues of fact can be resolved as in Langman. Thank you, Your Honor. Thank you very much. Well argued. We will reserve decision.